**RYDER TRUCK LINES, INC., Plaintiff,**

v.

**GOREN EQUIPMENT CO., INC., Defendant.**

**Civ. A. No. C82–1351A.**

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 20, 1983.

Robert N. Dokson, Atlanta, Ga., for plaintiff.

Ronald S. Stevens, Atlanta, Ga., for defendant.

## ORDER OF COURT

HORACE T. WARD, District Judge.

This is a diversity action in contract for collection of money owed to plaintiff arising out of a contract between the plaintiff and the defendant dated January 29, 1982 (hereinafter "The Contract") for the sale of used diesel engines by the plaintiff to the defendant. Defendant has filed a counterclaim in this action alleging actionable fraud and duress in the creation of the contract, in effect claiming that the contract is unenforceable for the foregoing reasons, and therefore it should be relieved of any obligations thereunder. This matter is currently before the court on the plaintiff's motion to amend the complaint and on plaintiff's motion for summary judgment.

## MOTION TO AMEND COMPLAINT

Plaintiff has moved to amend its complaint to add the following paragraph 10 to Count 1 of its complaint:

### 10.

Pursuant to the provisions of a "Stipulation and Agreement" executed by the parties, through their respective counsel, on July 20, 1982, plaintiff is entitled to a retaking credit of $72,000.00, less any claims plaintiff may have or costs or expenses of said retaking under the contract between the parties.

Plaintiff further seeks to amend the complaint by striking subparagraph (b) of the prayer for relief of Count 1 and by replacing it with the following:

(b) The Plaintiff be awarded judgment against the defendant in the amount of $181,125.00, plus costs or expenses of retaking twenty-four engines pursuant to the Stipulation and Agreement between the parties dated July 20, 1982, together with interest as provided in the Agreement and as provided by applicable law.

Plaintiff states that the parties herein entered into a Stipulation and Agreement relating to the retaking of certain of the engines at issue in this litigation. The Stipulation called for a "retaking credit" for any engines retaken by plaintiff, the

amount of which retaking credit was to be agreed upon jointly between a representative of plaintiff and a representative of defendant. Pursuant to the provisions of paragraph 7 of the Stipulation and Agreement, plaintiff states that it is obligated to amend its complaint to reflect the "retaking credit."

For good cause shown, and there being no objections filed by the defendant, it is hereby ORDERED that plaintiff's motion to amend the complaint is GRANTED.

## MOTION FOR SUMMARY JUDGMENT

Count 1 of the plaintiff's complaint seeks recovery in contract for amounts owed by the defendant to the plaintiff in connection with the sale of seventy-five (75) used diesel engines. Count 2 of the complaint seeks the appointment of a receiver. Plaintiff has moved for summary judgment as to Count 1 of the complaint and as to defendant's counterclaim which alleges fraud and duress in the creation of the contract.

Based on the briefs of both counsel and the documents submitted in support of or in opposition to the plaintiff's motion for summary judgment, the court makes the following:

## FINDINGS OF FACT

1.

Ryder Truck Lines, Inc. (hereinafter "Ryder") is a Florida corporation with its headquarters in Jacksonville, Florida. Ryder is engaged in various trucking enterprises, including, but not limited to, interstate trucking and freight delivery. As a consequence of its trucking enterprises, Ryder sometimes has used truck engines for sale to purchasers of such products, as in this particular case.

2.

Defendant Goren Equipment Company, Inc. (hereinafter "Goren") is a Georgia corporation with its principal place of business at Mableton, Georgia in the Northern District of Georgia. Goren is in the business, *inter alia*, of buying and selling used truck engines and engine parts from companies like Ryder for resale to other trucking industry companies in the United States and internationally.

3.

At some time around May, 1981, Ryder and Goren entered into an agreement for Ryder to sell to Goren eighty-nine (89) Detroit Diesel Engines, model no. 8V–71N for a price of $3,750.00 per engine. During the course of delivery of the engines under this agreement some problems arose and Goren became dissatisfied with the engines being provided under the Agreement. Specifically, Goren claimed that many of the engines being provided had mileage in excess of what Goren had been told; and further, Goren claimed that the warranties given by Detroit Diesel, the engines' manufacturer, applicable to each engine were not sufficient because these warranties were not applicable outside the United States and Goren intended to sell the engines in Mexico.

4.

Goren brought its dissatisfaction to the attention of Ryder during the Fall of 1981. During this same time period Goren fell behind in payments. Thereafter, from approximately October, 1981 until January, 1982, Goren and Ryder engaged in negotiations to revise the May 1981 agreement so as to resolve these points of possible conflict amicably. During these negotiations Goren made a proposal to Ryder for a readjustment of the agreement, but Ryder rejected Goren's proposal. Thereafter, Ryder sent to Goren a counterproposal which after further negotiations was agreed to and entered into as a new agreement dated January 29, 1982 ("the Contract"). The Contract reduced the engine prices for all engines still to be delivered from $3,750.00 per engine to $3,000.00 per engine as a way to redress Goren's complaints.

5.

The Contract contained provisions, *inter alia*, relating to:

(a) the assets purchased (¶ 1);

(b) the price and existing indebtedness from the prior agreement (¶ 2);

(c) the reason for entering into the new Contract to waive or remedy any defaults in the earlier agreement (Preamble);

(d) lack of any warranties except those outstanding from Detroit Diesel (¶ 5);

(f) default and remedies thereon, including provisions for acceleration, collection of interest, attorneys fees and liquidated damages (¶¶ 7 and 8);

(g) applicability of Florida law (¶ 9); and

(h) the entirety of the agreement with no other promises and representations (¶ 10).

6.

All of the engines provided under the Contract were delivered by Ryder to Goren. At the time of filing of this lawsuit, Goren had possession of approximately 29 of these engines, while 46 had been sold to buyers in Mexico.

7.

As recited in the Contract, Goren had made two payments totalling $37,500.00 for engines delivered prior to the execution of the Contract. Thereafter, Goren made one payment on the Contract after January 29, 1982 ($28,125.00 received on March 12, 1982) but failed to make any further payments despite demands to do so by Ryder. Thereupon, on April 30, 1982, Mr. Donald Braddock, Jacksonville, Florida counsel for Ryder, wrote a certified letter to Goren accelerating the debt and demanding payment.

8.

Negotiations continued between Ryder (or its counsel) and Goren for several months during which time Goren kept promising to make payments under the Contract as soon as possible. When by June of 1982, payment still was not forthcoming, Ryder authorized this suit, which was commenced on June 29, 1982.

9.

Following the filing of this lawsuit, the parties entered into an agreement under which Ryder retook possession on July 22, 1982 of 24 of the engines still in the possession of Goren, and gave Goren a "retaking credit" of $72,000.00 less expenses of retaking those engines. The retaking costs to Ryder were $5,343.01 leaving a net credit of $66,656.99.

10.

The amount initially owed under the Contract was $206,250.00. However, the Contract specifically includes a liquidated damages provision which calls for a judgment amount of $281,250.00 less payments made as set out in paragraph 2 of the agreement. Also, Goren has admitted that it owes Ryder $1,475.00 on open account outside the Contract.

11.

Paragraph 8(c) of the Contract provides that where Ryder obtains a judgment for the amount of the purchase price remaining unpaid under this agreement, the interest shall be calculated at the highest rate allowed by Florida law on such delinquent payments from the date they are due to the date of collection. The highest rate allowed by Florida law is 18%. Therefore, the interest due is calculated as follows:

(a) 15 days for delinquency on Feb. 25th installment (received March 12, 1982) – 18% on $28,125 for 15 days equals      $208.04

(b) 36 days for delinquency on March 25th installment until date of acceleration (April 30, 1982) – 18% on $28,125 for 36 days equals      $499.31

(c) 5 days for delinquency on April 25th installment until date of acceleration (April 30, 1982) – 18% on $150,000 for 5 days equals      $369.86

(d) 83 days for delinquency on the total Contract accelerated balance of $178,125 per Paragraph 8(c) of the Contract [1] – from April 30, 1982 until July 22, 1982 (the day of retaking the 24 engines) – 18% on $178,125 for 83 days equals      $7,290.92

(e) 516 days for delinquency on balance of $111,468.01 after net credit for retaking twenty-four (24)

---

1. This figure does not include the additional $1,475 stipulated by Goren as also owing on its open account. It only includes the principal balance on the Contract for the engines.

engines from July 22, 1982 until December 20, 1983 – 18% on $111,468.01 for 516 days equals     $28,364.79

(f) $54.97 per day for each and every day from December 20, 1983 until judgment on outstanding principal balance of $111,468.01.

Therefore, the total interest due under the Contract is $36,732.92 as of December 20, 1983, plus $54.97 per day for each and every day until judgment.

12.

Goren claims both as a defense and as a counterclaim that the Contract was procured by fraud and duress and is therefore unenforceable.

13.

Any misrepresentations which Ryder or anyone connected with Ryder is alleged by Goren to have made to Goren all pre-dated the signing of the Contract on January 29, 1982. David Goren read and signed the Contract, as well as initialling several changes therein. In addition, the warranty problems complained of by Goren all occurred and were known to him prior to the execution of the Contract.

14.

On November 10, 1982, counsel for plaintiff sent to defendant, through its counsel (delivered November 16, 1982), a new demand letter for purposes of compliance with O.C.G.A. § 13–1–11 (formerly *Ga. Code Ann.* § 20–506) relating to enforceability of the attorney's fee provision in the Contract. That letter was received on November 16, 1982.

## CONCLUSIONS OF LAW

### A. *Choice of Law*

In resolving the various claims presented in this diversity action, the federal court must follow the Georgia conflict of laws rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Georgia's conflicts rule states that the law of the state where the contract is made and performed will govern the validity and interpretation of the contract, unless the parties have chosen the law of a particular state to govern their contractual rights and responsibilities. In that event, the choice of law provision in the contract will be applied, except where the chosen state has no substantial relationship to the parties or the transaction, or the result obtained from the applicability of the law of the chosen state would be contrary to Georgia's public policy. *See, 5 Encyclopedia of Georgia Law, Conflict of Laws,* §§ 27, 11; *Restatement (Second) of Conflict of Laws,* § 187 (1971). Cf. *Nasco v. Gimbert,* 239 Ga. 675, 238 S.E.2d 368 (1977).

In the case at bar, paragraph 9 of the January contract provides that the agreement shall be governed by the laws of Florida. The issues of fraud and duress, however, relate to the validity of the contract as a result of alleged pre-contract misrepresentations, and are matters outside the contract. Furthermore, contracts procured by fraud and/or duress are contrary to the fundamental policy of the state of Georgia, as is a damages provision in a contract which purports to be liquidated damages, but instead is a penalty to deter a person from breaching the contract. As these issues involve matters of public policy in Georgia, the court will apply Georgia law in resolving the issues of fraud, duress, and the enforceability of the liquidated damages provision, notwithstanding the parties' choice of Florida law provision in the Contract. On the other hand, the court does not find the questions of interest and attorney's fees to be matters of important public policy where such items are provided for in the contract. These issues are governed by the agreement, and therefore Florida law will be applied in deciding these issues.

### B. *Duress*

Plaintiff contends that it is entitled to summary judgment as a matter of law on defendant's defense and counterclaim alleging duress. Defendant argues that it is entitled to void the January contract on the grounds of duress because the plaintiff threatened to "blackball" defendant's company in the trucking industry if defendant

did not enter into the Contract, and due to these wrongful and illegal threats, defendant was forced to enter into the Contract against its free will. Plaintiff contends that economic pressure is not sufficient to constitute duress as a matter of law, and therefore this defense must fail.

■ It is well settled under Georgia law that duress, either by threats, or other acts, by which the free will of the party is restrained and his consent induced, renders the contract voidable at the election of the injured party. O.C.G.A. § 13–5–6. However, as plaintiff contends, economic pressure is insufficient to constitute duress in the legal sense.

The Supreme Court in *Tidwell v. Critz*, 248 Ga. 201, 204, 282 S.E.2d 104 (1981) clearly held that "one may not void a contract on the grounds of duress merely because he entered into it with reluctance, the contract is very disadvantageous to him, the bargaining power of the parties was unequal or there was some unfairness in the negotiations preceding the agreement." *See also Fields v. Thompson*, 164 Ga.App. 331, 332–333, 297 S.E.2d 100 (1982); *Woods v. Wright*, 163 Ga.App. 124, 126, 292 S.E.2d 545 (1982).

■ In the case at bar, any alleged threats by plaintiff that it would "blackball" defendant's company in the trucking industry by telling customers not to do business with the defendant if the defendant did not sign the January contract, or any unequal bargaining power was not such as to coerce the defendant into signing the January agreement against its free will. Defendant could have chosen not to sign the January contract and pursued its legal remedies in tort or for breach of contract. Instead, defendant, being in a difficult bargaining position, succumbed to economic pressure placed upon it by the plaintiff and chose to sign the agreement. It has already been established that one may not void a contract on the grounds of economic duress. *Tidwell v. Critz, supra.*

Accordingly, the January contract is valid and remains in full force and effect.

### C. *Fraud*

Defendant has alleged that plaintiff made certain false, fraudulent and/or misrepresentative statements to the defendant to induce it to enter into the contract, and such statements provide a defense or basis for recovery in counterclaim.

Plaintiff argues that it is entitled to summary judgment on this claim because all of the alleged misrepresentations and/or false statements pre-dated the signing of the contract, emanating from the May 1981 agreement, and the January contract contains a merger clause which precludes defendant from raising claims of fraud or misrepresentation.

Upon reading all of the pleadings, briefs, and other documents in the record, it is apparent that while defendant contends that there was fraud and duress in connection with the January written agreement, defendant's main and only defense to the enforceability of the January agreement is that the contract was signed under duress. Defendant has set forth facts showing that it signed the January contract under duress, however, said duress was economic duress, which, as previously stated, is not sufficient as a matter of law, to void the January agreement. Defendant's fraud claim, on the other hand, relates to alleged fraudulent misrepresentations and warranties which were made at or about the time the May 1981 agreement between the parties was executed. As the representations upon which defendant bases its claim of fraud pre-dated the signing of the January agreement, we must now turn to the merger clause in the January contract.[2]

■ The January agreement provides in relevant part in paragraphs 5 and 10 as follows:

  5. *Warranties.* The purchased assets are sold as is and where is. No

2. The January agreement was a modification of the May contract and superseded the May agreement.

representation or statement has been made by the Seller concerning the purchased assets, except as herein stated, and no warranty, express or implied, by Seller, arises apart from this writing, except that Seller represents that the purchased assets are subject to such warranty as Detroit Diesel has outstanding, which the Buyer has investigated and is fully aware of the terms and conditions of said warranty issued by Detroit Diesel.

10. *Entire Agreement.* This agreement constitutes the entire agreement between the parties and includes all promises and representations, express or implied, made by the Seller and the Buyer and by either of them.

Because of the merger clause in the contract, the defendant is precluded from asserting a fraud claim based on fraudulent misrepresentations which pre-dated the contract, unless the defendant can show that there was fraud in the procurement of the contract.

In order to establish a claim for fraud the defendant has the burden of proving: 1) that false representations were made by the plaintiff; 2) that plaintiff knew the representations were false when made; 3) that said representations were made with the intention to induce the defendant to act or refrain from acting in reliance on the representations; 4) that defendant justifiably relied on the representations; and 5) that defendant has suffered damage as a proximate result of the alleged false representations. *City Dodge v. Gardner,* 232 Ga. 766, 769–770 n. 1, 208 S.E.2d 794 (1974).

For the reasons set forth below, the court concludes that defendant cannot prove the fourth element needed to establish a claim of fraud because it is barred by the merger clause referred to herein from asserting any reliance on any alleged fraudulent misrepresentations which · predated the signing of the January contract. *See Condios, Inc. v. Driver,* 145 Ga.App. 537, 244 S.E.2d 85 (1978).

In the instant case, the evidence shows that in May of 1981 the parties entered into a written contract for the purchase by the defendant of 89 used diesel engines from the plaintiff. During the fall of 1981 problems arose and the defendant complained to the plaintiff about false representations and warranty problems in connection with the engines being provided in the agreement. From approximately October 1981 to January 1982 the parties engaged in negotiations to revise the May 1981 agreement. On January 29, 1982, the parties executed a written agreement which superseded the May agreement. The purpose of the January agreement was to redress the defendant's complaints. In that contract, the parties agreed to lower the price of 50 used diesel engines from $3,750 to $3,000, and defendant was to pay the existing indebtedness on 25 used engines at the original price of $3,750 per engine.

Furthermore, prior to signing the January contract, defendant had the contract in its possession and had sufficient opportunity to thoroughly review the contents of the contract, including the merger clause. Based on these facts, there was no fraud upon which defendant relied which prevented it from knowing the contents of the contract and which induced it to execute the contract. Moreover, as previously stated, during the fall of 1981 defendant complained that plaintiff had made false representations to it and that there were problems with the warranties. Therefore, at the time the defendant signed the January contract it knew of these alleged false representations and warranty problems. Accordingly, defendant could not have relied on any alleged false representations at the time it signed the January contract. For the foregoing reasons, defendant's fraud claim must fail.

### D. *Consideration*

This issue was only briefly addressed in the motion for summary judgment and response thereto, however, the court feels it necessary to mention the issue.

Defendant, in its answer to the complaint, alleged as a defense to the validity of the contract that there was a lack of

consideration. The court finds this contention to be clearly without merit. Plaintiff sold and delivered to defendant the engines provided under the contract. Plaintiff was not obligated to do this. Furthermore, defendant was not obligated to purchase the engines. In addition, both parties waived all prior defaults by the other party. Clearly, each promise was sufficient consideration for the other in this arms-length transaction. For the foregoing reasons, this defense to the contract must also fail.

In sum, plaintiff's motion for summary judgment as to Count 1 of the complaint (defendant's liability) and as to defendant's counterclaim based on fraud and duress is GRANTED.

### E. *Liquidated Damages*

■ Paragraph 8(d) of the January agreement provides:

> The Seller shall have the right to a judgment for liquidated damages, and not as penalty, in the amount equal to Two Hundred Eighty-One Thousand Two Hundred Fifty Dollars ($281,250.00) less all amounts previously paid by the Buyer to the Seller under paragraph two (2) herein, together with court costs, attorney's fees and interest from the date hereof at the highest rate allowed by Florida law.

Under Georgia law, "if the parties agree in their contract what the damages for a breach shall be, they are said to be liquidated and, unless the agreement violates some principle of law, the parties are bound thereby." O.C.G.A. § 13–6–7 (*Ga. Code Ann.* § 20–1402). In other words, a liquidated damages provision in a contract will be upheld if it is truly in the nature of liquidated damages and is not a penalty. If the liquidated damages provision is found to be a penalty, that provision is void and unenforceable.

■ In determining whether a damage provision is truly liquidated damages or a penalty, the court must make a tripartite inquiry:

> First, the injury caused by the breach must be difficult or impossible of accurate estimation; second, the parties must

intend to provide for damages rather than a penalty; and third, the sum stipulated must be a reasonable pre-estimate of the probable loss.

If these three factors are present, then the liquidated damages provision is enforceable. *Southeastern Land Fund, Inc. v. Real Estate World, Inc.*, 237 Ga. 227, 230, 227 S.E.2d 340 (1976).

We now turn to the first factor—whether the injury caused by the breach was difficult or impossible of accurate estimation at the time the contract was signed. Plaintiff argues that the damages upon default were uncertain because the contract provided that plaintiff could repossess any unsold engines in case of default. (See paragraph 8(b) of contract.) It was not certain what the costs of repossession would be nor was the amount of credit for any repossession certain because such amount would be dependent on the resale price.

Defendant argues that the damages arising from the breach were definitely calculable because plaintiff could either repossess the unpaid engines or sue for the amount owing, based upon the contract price of $3,000 for the 50 engines.

■ While it is true that the plaintiff could have repossessed the unpaid engines or sued for the amount owing on the unpaid engines, had plaintiff repossessed the engines, it would have had the option of reselling those engines in an attempt to "cover," and it would be able to recover the difference between the resale price and the contract price. *See* O.C.G.A. § 11–2–706. The question is not whether the formula for properly measuring damages was known at the time the Contract was signed, but rather whether the extent and amount of possible damages was uncertain at that time. *Thorne v. Lee Timber Products, Inc.*, 158 Ga.App. 226, 279 S.E.2d 521 (1981). Under the circumstances of this case, the court concludes that the extent and amount of damages were difficult or impossible to accurately estimate at the time the Contract was executed.

The second factor which must be present is that the parties intended to provide for damages rather than a penalty. Some weight must be given to this factor because both parties did sign the Contract which stated that the provision was liquidated damages and not a penalty. However, the execution of the agreement containing this clause is not by itself determinative of the intent of the parties. The court does take note that the Contract was prepared by the plaintiff, and that defendant has contended that the Contract was signed under duress. For these reasons, the court has doubts as to whether this provision was intended truly as liquidated damages rather than a penalty.

Finally, the sum stipulated must be a reasonable pre-estimate of the probable loss. In light of the amount to be paid under the Contract, the court concludes that the sum of $281,250.00 was not a reasonable pre-estimate of the probable loss in the event of a breach. The total amount to be paid under the Contract was $206,250.00. The court finds that a pre-estimate of probable loss in the amount of $37,500 more than the amount due under the Contract is highly unreasonable, even in a fluctuating market. Moreover, it appears that the figure chosen was arbitrary, leading the court to again suspect that the amount may have been a penalty to deter defendant from breaching the Contract. As the defendant correctly notes, $281,250.00, divided by 75 (the number of engines under the Contract) is equal to $3,750 per engine—the original price of the engines under the May agreement. The court also notes, as does the defendant, that the interest in the liquidated damages provision was to run from the signing of the agreement (January 29, 1982) rather than from the breach of the Contract. This portion of the liquidated damages provision is also unreasonable.

For the foregoing reasons, the court concludes that the liquidated damages clause in the contract was a penalty and was not a *bona fide* attempt to liquidate damages. Accordingly, that provision in the Contract is void and unenforceable.

### F. *Expenses of Retaking Twenty-four (24) Engines*

Paragraph 8(b) of the Contract clearly provides:

> The Seller may repossess the purchased assets still in the possession of the Buyer and the Buyer agrees to pay all expenses, charges and costs that the Seller may reasonably incur in exercising any rights of the Seller under this agreement including court costs and attorney's fees, and obtain a judgment for any deficiency.

Defendant has failed to set forth any argument on this issue which has any merit. The court finds the shipping expenses incurred by the plaintiff in retaking the 24 engines to be reasonable. Pursuant to the Contract, plaintiff is entitled to recover $5,343.01 for retaking expenses.

### G. *Actual Damages*

It is undisputed that the total amount due under the Contract was $206,250.00— the cost of 50 engines at $3,000.00 per engine, and the remaining indebtedness of $56,250.00 on 25 used engines. Defendant made one payment of $28,125.00 and was given a retaking credit of $72,000.00 for the repossession of 24 engines at $3,000.00 per engine, minus $5,343.01 for retaking expenses. It is further undisputed that defendant owes plaintiff $1,475.00 on an open account outside the Contract.

Accordingly, defendant is liable to plaintiff in the principal amount of $111,468.01 under the Contract and $1,475.00 on open account making a total of $112,943.01.

### H. *Interest*

In an action for breach of contract, the interest on the principal amount due accrues from the time of the breach where the amount of liability is ascertainable from the contract. *Mar-Len Housing Enterprises v. Mar-Len Gardens "I" Corp.*, 302 So.2d 469 (Fla. 3d DCA 1974). Thus, pursuant to paragraph 8(c) of the agreement, plaintiff is entitled to interest at the

highest rate allowed by Florida law on such delinquent payments from the date they were due until the date of judgment. Florida Statute § 687.02 provides that 18% per annum simple interest is the highest rate allowed.

Accordingly, based on the court's calculations listed in paragraph 11 of the Findings of Fact herein, the court concludes that the total interest due under the Contract is $36,732.92 as of December 20, 1983, plus $54.97 per day for each and every day until judgment.

## I. *Attorney's Fees*

■ Paragraph 9 of the Contract states, "in the event court action is necessary to interpret and enforce this agreement, then the prevailing party shall be entitled to an award of court costs, including reasonable attorney's fees." Therefore, pursuant to said paragraph, plaintiff is entitled to an award of reasonable attorney's fees and related expenses upon proof of the expenses incurred and the reasonableness thereof. *See Richard v. Lumb,* 339 So.2d 1147, 1148 (Fla. 3d DCA 1976); *Carol Management Co. v. Baring Industries,* 257 So.2d 270 (Fla. 3d DCA 1972); *Selph v. Commercial Credit Corp.,* 135 So.2d 241 (Fla. 3d DCA 1961).

Plaintiff's counsel, Mr. Robert Dokson and Mr. Donald Braddock, have attested by affidavit that the actual expenses incurred in this litigation are $10,490.91. Mr. Dokson specifically states that the legal fees billed by him were $9,125.00. These legal fees involve over 100 hours of his and his partner's time billed at a rate of $85.00 per hour, although the firm's standard rate for partners' time in commercial litigation matters is $100 per hour. The related expenses incurred by the plaintiff are $515.91. These expenses involve primarily xeroxing charges, long-distance telephone charges, court reporter fees, filing fees and mileage charges. Mr. Dokson further shows that he has been a member of the Georgia Bar for almost 14 years, that he

practiced law for over 10 years with the Atlanta Legal Aid Society, and that for the past 2½ years, he has specialized in commercial litigation. Mr. Braddock, also a licensed and practicing attorney for at least 14 years, states that legal fees for services rendered by him amount to $850 for 8.5 hours spent representing the plaintiff at a rate of $100 per hour.

■ In determining the reasonableness of the legal fees and related expenses, the court has considered: 1) the time and labor required; 2) the amount involved and the results obtained; 3) the experience, reputation and ability of the attorneys; 4) their customary fee per hour; and 5) the difficulty of the issues. The court finds that the amount of time and labor required was reasonable given the nature of the litigation. Several of the issues were difficult and presented choice of law problems which required the research of both Georgia and Florida law. Furthermore, both attorneys have been practicing law for approximately 14 years, and their usual fee per hour for commercial litigation is $100 per hour, which appears to be the customary rate in Atlanta and in Duval County, Florida. The court notes that only 8.5 hours were billed at a rate of $100 per hour while approximately 107 hours were billed at a rate of $85 per hour (15% lower than the usual rate per hour). Moreover, the plaintiff has prevailed on its motion for summary judgment and the litigation expenses incurred are less than 10% of the judgment on the principal amount due under the contract.

Finally, given the nature of this litigation, the preparation of the motion for summary judgment, the taking of depositions, and the fact that plaintiff is a Florida corporation, which may have necessitated various long-distance telephone calls, the court finds $515.91 to be reasonable costs incurred in this litigation.

For the foregoing reasons, the court concludes that an award of attorney's fees and

related expenses in the amount of $10,-490.91 is reasonable, and plaintiff is entitled to recover same.

## CONCLUSION

It is hereby ORDERED that plaintiff's motion to amend the complaint and motion for summary judgment as to Count 1 of the complaint and as to defendant's counterclaim are GRANTED.[3]

It is further ORDERED that plaintiff is entitled to recover from the defendant:

1) $1,475 due on open account; plus

2) $111,468.01—the principal amount due under the Contract; plus

3) $36,732.92 in interest as of December 20, 1983, and $54.97 per day in interest on the unpaid amount of $111,468.01 for each and every day after December 20, 1983 until judgment; plus

4) $10,490.91 as reasonable expenses of litigation, including attorney's fees.

Judgment in favor of the plaintiff and against the defendant shall be so entered.

Further, it appears to the court that Count 2 of the Complaint (the receivership count) may be moot. Therefore, Count 2 is DISMISSED WITHOUT PREJUDICE to the plaintiff's right to reopen the case and to proceed with the receivership count within thirty (30) days from the date of this Order.

---

3. It also appears that there was a pending motion to compel. Given the disposition of this case, that motion is now moot.